(No. 70642.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JUAN CABALLERO, Appellant.

*Opinion filed October 15, 1992.—Rehearing denied December 7, 1992.*

Alan Raphael, of Chicago, and Seth Kaberon, law student, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Walter P. Hehner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

Defendant, Juan Caballero, directly appeals to this court pursuant to Supreme Court Rule 651(a) (134 Ill. 2d R. 651(a)) regarding the denial of his post-conviction petition relief by the circuit court of Cook County. We affirm.

On March 23, 1984, this court affirmed defendant's conviction and death penalty sentence on direct appeal in *People v. Caballero* (1984), 102 Ill. 2d 23. On June 4, 1984, this court denied defendant's motion for rehearing. The

United States Supreme Court denied *certiorari* on October 29, 1984.

Eventually, defendant filed a petition for post-conviction relief. Defendant alleged that he was denied effective assistance of counsel at the sentencing hearing. The circuit court dismissed the petition without an evidentiary hearing. On appeal, this court held that the allegations raised a substantial constitutional deprivation. This court remanded the cause for an evidentiary hearing. *People v. Caballero* (1989), 126 Ill. 2d 248.

On June 19-20, 1990, the circuit court of Cook County held a two-day hearing. At the conclusion of the hearing, the court found that defendant had not met the two requirements to establish ineffective assistance of counsel as set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. The requirements are:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.)

The trial court found that defendant failed to show that (1) the trial attorney did not perform in a manner that was beyond the standard of a reasonable, competent attorney in the manner in which he conducted the activity in the sentencing hearing, and (2) there was reasonable probability that but for his counsel's unprofessional errors the outcome of the trial would have been different. The defendant

must show that he was prejudiced by his attorney's actions.

Defendant raises only one issue in this appeal: whether defendant received effective assistance of counsel at his sentencing hearing. Since the facts at trial were adequately set forth in the opinion of this court in defendant's first direct appeal, we will repeat only those facts necessary to this appeal.

The evidence adduced at trial is as follows. The defendant gave a detailed confession of his guilt, which was admitted at the original trial. In his confession, the defendant told how he and his three companions abducted three victims, one of whom allegedly was a member of a rival gang. In defendant's confession, he admitted that he personally stabbed and cut the throat of one of the victims. Extensive physical and forensic evidence corroborated many of the details of the confession. At the trial, defendant testified in his own behalf, repudiating his confession saying that it was extracted by the use of force.

At the evidentiary hearing on June 19, 1990, it was revealed that several witnesses stated that they would have testified on behalf of the defendant at the mitigation stage of the sentencing hearing. Five of the 12 witnesses were staff members of Inter City Impact (ICI), William Dillon, Donald Gillaspie, Tina Jakus, Grace Constable, and Wayne Gropp. Two were members of defendant's family. Only two witnesses at the evidentiary hearing testified at the trial, Frank Blatnick and Shirley Gibbons. The remaining three witnesses were Reverend Douglas Moore and his wife, Connie Moore, and Akim Gursel, defendant's trial counsel. Defendant presented those 12 witnesses. The State presented no evidence.

Defendant's counsel, at the evidentiary hearing, argued that defendant did not receive effective assistance of counsel at the sentencing hearing because trial counsel failed "to introduce the mitigating testimony of several potential

witnesses solely because they were not categorically opposed to the death penalty in all situations" and "failed to contact or investigate other mitigation witnesses who were suggested by defendant's family and who could have attested to defendant's background and character." The testimony at the hearing revealed the following facts.

The first witness to testify was Reverend Douglas Moore, who was at that time pastor of the First Evangelical Free Church of Los Angeles. He first met defendant and his family in 1974 while he was pastor at another church called the Salem Evangelical Free Church Hispanic congregation. He was pastor at the Salem Church from 1974 to 1982.

Reverend Moore visited with defendant at the jail from the time defendant was arrested until the time of the trial. He visited at least once a month. He had "fairly" extensive discussions relating to matters about the Bible, God and family. During those visits, Reverend Moore was impressed with defendant's gentle demeanor. Defendant was always very respectful and caring. Defendant would always ask about family. Reverend Moore stated that defendant was a follower.

Reverend Moore attended every day of the trial because he believed that his role was to be aware of what was happening and to communicate to defendant's family, especially defendant's mother, who did not understand English.

Reverend Moore met defendant's trial attorney, Akim Gursel, at the trial. He would talk to counsel during breaks at the trial. He explained to Gursel his relationship to defendant and his family. Gursel only talked to him about testifying at the sentencing hearing on the date defendant was found guilty. The next couple of days, they talked about what needed to be done. A meeting was called on the Sunday following the conviction, which was

on a Friday, at Reverend Moore's home. The following Monday, the court scheduled the sentencing hearing.

At the meeting, approximately 10 to 12 people were in attendance. Gursel explained at the meeting what was going to happen the next day and the need to have character witnesses. However, he did not recall Gursel's discussing any strategy. He recalled that Gursel did ask opinions on the death penalty. Gursel did not ask him directly about his opinion, but he gave it anyway. Reverend Moore stated that the death penalty was appropriate for people in the Mafia and for premeditated and multiple murders, but he did not believe that it was appropriate for defendant. Reverend Moore stated that he offered to testify, but Gursel said he could not be used because he would be giving a pastoral blessing to the jury to allow it to give the death sentence to defendant.

Reverend Moore also recalled a conversation with defendant's older brother, Jose. Jose was weeping and saying that he never thought it would come to this and that it was his fault. Jose told him that defendant left ICI because he persuaded defendant to leave.

Under cross-examination, Reverend Moore stated defendant was not a member of his congregation before he was arrested. Reverend Moore's first extensive contact with defendant was after the arrest. Reverend Moore visited defendant in jail to administer to his spiritual needs.

Reverend Moore explained that defendant should not receive the death penalty because he felt it was a "horrible mistake" done in one day. He did not believe defendant would do it again. Reverend Moore explained further that Jose told him that he had pulled defendant away from ICI and into the Latin Kings street gang.

During redirect examination, Reverend Moore stated that although defendant was not a member of his congregation, defendant's mother was a faithful leader of the church, a deaconess.

Attorney Akim Gursel testified next at the hearing that he represented defendant at his capital trial in 1979. Prior to representing defendant, he did not attend any program regarding the presentation of mitigating evidence in a death penalty case. Gursel did not bring the case file because he no longer had it, but stated he did recall it because it was a major case.

Gursel stated that, prior to the start of the trial, he spoke to family members regarding the two stages of the trial. He explained to them that in the event of a conviction, he would need evidence from people who had helped the defendant in school, older people in the neighborhood defendant had helped, anybody defendant had talked to about what he had "dealt with," things defendant had done in the community with other young men that may have had trouble or any younger person whose father may have been deceased. Gursel was looking for anything of human interest. As Gursel recalled, the witnesses called at the sentencing hearing were chosen after a conversation with Reverend Moore and with Charles Hogan, a Cabrini Green legal aide.

After the trial started, Gursel spent the next two weeks prior to defendant's conviction "trying to get individuals who would tell [him] that they knew somewhat of [defendant's] background, particularly a teacher." Gursel talked to defendant's sister, Gabriella Caballero, on numerous occasions to find someone, if he should lose the case, who would be able to be a character witness. He asked for "an older person he may have helped in the neighborhood, a teacher who could tell him what defendant may have done in school in terms of leadership and capacity with other young people."

Since Gursel did not speak Spanish, he could not talk to defendant's father, who only spoke Spanish. Defendant's mother spoke in "halting and limited" English. Consequently, defendant's sister, Gabriella Caballero, became the

interpreter for Gursel. Defendant spoke fluent English. Gursel did not hire any Spanish-speaking investigator to look for mitigating witnesses. Furthermore, Gursel stated that he was willing to go into the Spanish community and use street contacts to develop information about defendant's alleged affiliation with street gangs, but no one provided information.

Gursel also talked to defendant about mitigating witnesses, but defendant made no suggestions. He recalled that defendant felt that as a young Spanish man in an alien country, he was not going to get any help. Gursel talked with defendant about witnesses at the sentencing hearing throughout the case, but only indirectly because he did not want to psychologically harm defendant. Gursel could not recall specifically how many times he talked to defendant. He could only recall what his trial strategy was in a death penalty case. He would generally ask questions about religion, education, involvement with social agencies, criminal history, memberships in clubs or athletic teams, work history and friends.

Finally, Gursel watched the jury closely at trial. He specifically noted that it took seven hours to convict defendant, and 45 minutes to convict a codefendant. Based on those observations, he assessed that the jury did not want to impose the ultimate punishment on defendant.

Gursel did not recall asking defendant about his relationship to the mitigating witnesses or why he rejected any of the mitigating witnesses. He could not recall how much time he spent interviewing the various mitigating witnesses. Furthermore, he could not recall a meeting that was held after the jury returned the guilty verdict, but prior to the sentencing hearing. He did not recall asking the prospective mitigating witnesses questions regarding their opinions of the death penalty. He could not recall any specific questions asked of the mitigating witnesses, nor could he recall asking anyone for any other witnesses who

knew defendant better than the mitigating witnesses called to testify. Although he could see that defendant came from a loving family, he could not recall why he did not call defendant's mother or sister to testify at the sentencing hearing.

Gursel did recall having extensive conversations with Reverend Douglas Moore. Reverend Moore attended the trial and explained the proceedings to defendant's mother. He did not recall asking Reverend Moore to be a witness at the sentencing hearing.

Gursel did not recall Reverend Moore and any other witness telling him that they believed the death penalty was appropriate in some cases. He stated that if Reverend Moore told him that, he would have excluded him as a witness because society would have said that it was warranted based upon the facts of the case. However, he did not recall why he did not ask Reverend Moore to testify. Furthermore, he stated that he would not have called a witness solely because he was absolutely against the death penalty, but would have rejected a witness based on the facts of the case.

Gursel recalled that defendant belonged to ICI and that he talked to some people there, but he did not recall whether that information was valuable. Gursel did not recall whether he asked defendant about the extent of his gang involvement.

Gursel did not recall any specific questions he asked of the following persons associated with ICI: Reverend William Dillon, executive director, Don Gillaspie, high school program director; Wayne Gropp, program director; Grace Constable, staff member; or Tina Jakus, junior high school director. He also did not recall if he asked them to testify or to give their opinion on the death penalty. He also did not recall interviewing J. Don Jonswald, basketball coach at Bethel Church, or Detective Brian O'Quin.

Don Gillaspie testified next at the evidentiary hearing. From 1976 to 1980, Gillaspie began to work full-time for ICI. During that time, he was the director of high school ministries. On a day-to-day basis, he dealt with youths from urban areas who were previously or subsequently arrested for crimes. After a couple of weeks with a youth, he could figure which ones would be trouble and those who would not.

Gillaspie first became acquainted with defendant in 1975 at a summer camp which was affiliated with ICI. When he started in 1976, he saw defendant fairly regularly because defendant would attend programs for his age group. Defendant was usually at ICI after school, on weekends and on days there were no scheduled programs. Defendant participated more than other youths his age.

Gillaspie would talk to defendant on a regular basis and sometimes on a day-to-day basis regarding personal problems. He found defendant to be a leader. Defendant was well-liked and was not aggressive, but rather a gentle person. To Gillaspie's knowledge, defendant did not carry a gun, drink alcohol or take drugs.

Gillaspie knew very little of defendant's brother, Jose. Only through hearsay, he knew that Jose was involved with the Latin Kings street gang. Gillaspie stated that Jose was the strongest influence on defendant.

Although Gillaspie knew that defendant eventually drifted away from ICI and became more involved with Jose and other gang members, he did not know exactly why defendant left. Approximately three months before the crime, defendant "was almost not there at all." In their discussions regarding gangs, defendant said he was concerned over Jose's involvement and wanted Jose to get out. At that time, defendant stated he did not want anything to do with gangs.

When Gillaspie heard about the crime, he was shocked. Although Gillaspie was willing to testify, Gursel never contacted him about testifying.

Under cross-examination, Gillaspie stated that although he was in contact with the family, he was never informed of the trial date. He also stated that he did not attend the trial because he was a full-time student in Deerfield, Illinois. He admitted that if called to testify, he would have testified to the fact that defendant drifted away from ICI and was participating in gang activity because of his brother's influence. However, he did not have any personal knowledge of defendant's gang involvement.

The next witness to testify was Gabriella Caballero, defendant's sister. She stated that she was a principal at Humbolt Community Christian School. However, at the time of defendant's arrest, she was 16 years old and in high school.

Gabriella was only able to attend the trial on the day her mother testified. She was acquainted with her brother's attorney, Akim Gursel, because she would talk to him when he would pick up the installment payments. Also, when Gursel came to the house, she became the interpreter for her mother because her mother was going to be called to testify about the day of the arrest. She was present for her mother's testimony to make sure the interpreter was correctly translating her responses.

Gabriella recalled that Gursel came out to the house four or more times, but he did not mention the sentencing hearing to her before or during the trial. He mentioned the sentencing hearing on the day of the conviction. He asked that her mother and Gabriella obtain people who knew defendant and would be able to testify. He did not ask for any names so that he could personally contact them.

Gabriella was at the meeting held at Reverend Moore's home, at which Gursel interviewed prospective mitigation

witnesses. She recalled that the meeting lasted about an hour and a half and that approximately 10 or so people were in attendance, including the following: Ruth Terrones, a neighbor; Shirley Gibbons, a neighbor; her mother; Reverend and Connie Moore; and herself. Her mother contacted the witnesses. Gursel had not met with any of the witnesses prior to the meeting at Reverend Moore's house.

Gabriella recalled that the meeting was a general, open meeting. Gursel directed some questions to individuals. She recalled that Gursel did not want to use Reverend Moore because he was not totally opposed to the death penalty. Although she was willing to testify, Gursel did not call her. No questions were directed to her regarding whether Gursel asked her about her opinion on the death penalty.

Gabriella recalled that her brother was a very gentle and caring person who was protective of her. She never heard of her brother's carrying a weapon. Defendant was not the type to start a fight, but he had been in fights as a result of self-defense. Her brother always worked and never missed a day of work unless he was sick. He would contribute part of his wages to the family.

Under cross-examination, Gabriella stated that she knew her brother joined the Latin Kings a year prior to his arrest. Gursel did not ask her about her knowledge of her brother's involvement with the gang.

The next witness to testify at the evidentiary hearing was defendant's mother, Victoria Caballero. She attended the trial with Reverend Moore as her translator. She talked to Gursel when he took the case and every time she came to court. When Gursel came to the house, he would tell her what was happening. He told them about the sentencing hearing in the context of what might happen. Gursel first asked her to obtain witnesses for the sentencing hearing when the jury found defendant guilty.

Victoria was at the meeting at Reverend Moore's house. Gursel, as well as five or six other people, were at the meeting. She and her daughter contacted the people. It was the first time Gursel met the people. Gursel asked people at the meeting for their opinions on the death penalty. Although she was willing to testify, Gursel did not ask her to do so. Under cross-examination, she recalled that defendant joined the Latin Kings when he started high school.

The next witness called was Frank Blatnick, who was, at the time of the hearing, assistant principal at Richard Yates Elementary School. Blatnick also testified at the sentencing hearing. He became familiar with defendant when defendant was a student in his class for part of the school year in either 1974 or 1975. He also knew defendant's mother because she regularly visited the school and attended meetings. She eventually was a member of the school council for years. When he taught defendant, he did not know if defendant was involved with gangs. To the best of his knowledge, defendant was not involved with gangs. After defendant left the school, he did not see him on a regular basis. His last contact with defendant was approximately two years prior to the trial. He would see defendant in the neighborhood because he lived and worked in the neighborhood.

Prior to the sentencing hearing, Blatnick was contacted by defendant's sister, Gabriella, about testifying. He did not attend the meeting at Reverend Moore's, but Gabriella came to see him after the meeting. Blatnick met with Gursel once and only in the hallway before the sentencing hearing. Gursel did not ask him his opinion on the death penalty. He did not recall Gursel's mentioning anything about defendant's gang activities.

The next witness at the hearing was Shirley Gibbons, a neighbor. She stated that defendant grew up with her children and was a frequent visitor at her house.

Gibbons met Gursel briefly a couple of days before the sentencing hearing. She also attended the meeting at Reverend Moore's house because defendant's mother asked her to attend. She recalled that the meeting lasted no longer than half an hour. Gursel asked her how long she had known defendant. Gursel did not ask her about defendant's membership in the Latin Kings or any other information regarding defendant's gang involvement. She was asked at the hearing if Gursel questioned her or any other potential witness regarding their opinions on the death penalty.

During cross-examination, she stated that she did not know whether defendant was a member of the Latin Kings.

The next witness at the hearing was Tina Jakus, who met defendant in 1976 at ICI. In 1976, she was an assistant program director who coordinated the junior high school girls program. She worked at ICI for 5½ years.

While at ICI, Jakus saw defendant about two or three times a week. Although defendant was not part of her program, he was part of a group of youths who came to ICI after school and "hung around." He was always willing to help her set up her program.

Jakus stated that defendant was quiet, somewhat introverted. Defendant never argued with her or made up excuses when asked to help. Defendant was not a troublemaker; he related well to other youths at ICI. She did not know about his gang involvement until after the murder. She was shocked when she heard about defendant's arrest. Jakus visited defendant once after his arrest with defendant's mother. She stated that defendant seemed remorseful. She stopped seeing defendant about a month before the arrest. She did not attend the trial.

Jakus was acquainted with Gursel. Gursel did not ask her to testify at the sentencing hearing, although she was willing to testify.

The next witness to testify at the hearing was Grace Constable, who worked at ICI from 1972 to 1975. She was first a volunteer for both the girls club and boys club programs. She eventually became part of the staff.

While at ICI, Constable interacted with the youths in the program. In 1972, she eventually became acquainted with defendant. On any given evening, she spoke to defendant two or three times. Defendant was faithful in fulfilling responsibilities. He enjoyed life. Defendant was a follower who had a charismatic personality. She never knew defendant to act aggressively or carry a weapon. She never knew defendant to drink alcoholic beverages or use drugs.

Although Constable left ICI to join the staff at another church, she still saw defendant because he would use the gym to play basketball with friends from ICI. However, she would only see defendant several times a year. When she did see him, he would always stop and talk to her for 20 to 30 minutes. However, she did not know that he ultimately left ICI.

Constable was shocked when she heard that he was arrested for and charged with murder. She stated that defendant was not a person to run wild. Approximately three weeks before the crime, she saw defendant at the Salem Mission Home, where she was on staff.

Constable attended only two days of the trial. She eventually met Gursel at the Sunday meeting at the home of Reverend Moore. At that meeting, Gursel asked her opinion on the death penalty. He did not tell her why he wanted to know. At that time, she did not have a definite opinion on the death penalty. She could not recall why Gursel did not ask her to testify. However, she recalled that from the conversation that went on for several hours, Gursel was looking for someone who was against the death penalty. At the meeting, Gursel also asked each per-

son how he or she knew defendant and his or her association with him.

The next witness at the hearing was Wayne Gropp, a pastor at the Good News Bible Church. He first met defendant in 1975 while he worked as a youth counselor at ICI. At that time, Reverend Gropp was an assistant in the high school program. He would see defendant every day after school for several hours over a long period of time. He was able to get to know defendant better than most other youths. They would discuss many subjects, including life situations.

Defendant was a good friend of Gropp's family. He trusted defendant with his three-year-old and four-year-old boys. He was shocked to hear about defendant's arrest. He never saw defendant in a fight or carry a weapon. Defendant was a follower. Defendant was mischievous, but he was normal for a boy of his age.

Gropp did not attend the trial, but followed its progress through defendant's family members. He told the family members that he was interested in testifying. He was not acquainted with Gursel. Gursel did not ask him to testify.

During cross-examination, he stated he did not recall at what point during or after the trial proceedings he told defendant's family members that he was interested in testifying. He does not know if that information was communicated to Gursel. He was present at the sentencing hearing. He was aware that when defendant left ICI he was involved with the Latin Kings.

Connie Moore, wife of Reverend Moore, testified next at the hearing. She stated that she was a volunteer English teacher at the church she and her husband managed. She was familiar with defendant and attended the trial every day except one. She visited defendant at least a couple of times a year prior to sentencing. She did not recall when Gursel mentioned anything about the sentencing hearing. She recalled a meeting held at her house at which

10 people attended. The meeting lasted about an hour. She stated that Gursel asked who they were and how they knew defendant, as well as explained what was going to happen. Gursel did not ask her if she was acquainted with defendant. She recalled that Gursel asked her husband about his opinion on the death penalty. Her husband stated that although he supported the death penalty, he did not believe it was appropriate in this case. Gursel told her husband that he would not be asked to testify because he believed in the death penalty. She did not recall any other reasons. She personally does not believe the death penalty is appropriate in this case.

During cross-examination, she stated that she had known defendant's family for years, but defendant did not visit her home. She would talk to defendant when she visited the family. She was not personally aware of defendant's gang activity.

William Dillon testified next at the hearing. Since 1972, he had been the executive director of ICI, which is a preventive-type ministry. ICI has three facilities which provide church-type ministries, off-the-street programs, drop-in centers, year-round programs, scholarship programs, and anything to impact the young people in those areas. ICI has programs outside of Chicago called camping ministry programs. ICI does have problems with losing the children to gangs.

Dillon recalled that for several years defendant was involved in the early years of ICI. Defendant's involvement was on a weekly basis and sometimes three or four times a week. Defendant enjoyed the camping programs. Dillon would sometimes spend a lot of time with defendant, other times not as much. Dillon even had defendant in his home. Since the organization has grown, he no longer has as much time to spend with youths like defendant.

In the early years of Dillon's acquaintance with defendant, he found defendant to love life and to respond to the

program and staff. Defendant had a lot of future. Defendant was not a violent person and did not carry a weapon. None of the staff reported any violent acts done by defendant. Defendant spent more time at ICI than the average youth. Defendant began to lessen his involvement as he became more involved with gangs. After defendant was arrested, Dillon visited him several times at the jail.

Dillon stated that he was at the meeting held at Reverend Moore's house. He speculated that the meeting lasted an hour and a half. He was willing to testify on defendant's behalf but does not recall if he was asked to do so. He does not recall Gursel telling him why he would not be called as a witness. He does not recall if Gursel asked him who from ICI would have been close to defendant, but he stated that Don Gillaspie was that person.

During cross-examination, Dillon stated that he did not attend the sentencing hearing. He also stated that defendant became involved with gangs during high school. He recalled that defendant was arrested and convicted for unlawful use of a weapon.

After closing arguments, the trial court denied defendant's petition for post-conviction relief. Defendant filed a direct appeal to this court and alleges ineffective assistance of counsel.

The standard for assessing whether an attorney's performance at a capital sentencing hearing was constitutionally deficient is set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. The *Strickland* standard requires the defendant to show: (1) that his attorney's performance at the hearing did not constitute reasonably effective assistance, judged by "prevailing professional norms" (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65) and (2) there is a "reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have con-

cluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

Defendant contends that he did not receive effective assistance of counsel because trial counsel (1) rejected mitigating witnesses who did not categorically oppose the death penalty; and (2) failed to conduct a thorough investigation for mitigating witnesses. Defendant argues that these errors were objectively unreasonable and, as a result, a reasonable probability existed that the outcome of the proceeding would have been different. See *People v. Caballero* (1989), 126 Ill. 2d 248, 269.

Even assuming a deficiency under the first prong of *Strickland*, the defendant must still demonstrate prejudice under the second prong. If the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer sufficient prejudice, the court need not decide whether counsel's errors were serious enough to constitute less than reasonably effective assistance. (See *People v. Eddmonds* (1991), 143 Ill. 2d 501, 511-12.) We find here that the errors defendant argues trial counsel committed did not result in any prejudice to defendant. Defendant thus cannot prevail on his claim for ineffective assistance of counsel.

To show sufficient prejudice under the second prong of *Strickland*, a defendant must show that the acts of counsel alleged to be outside the range of competence were actually prejudicial, *i.e.*, that they had an adverse effect on the outcome. (*Strickland*, 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S. Ct. at 2067.) In order to demonstrate actual prejudice, it must be shown that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

In making this assessment, a court must consider the totality of the evidence before the jury. (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) The *Strickland* Court provided a detailed guideline for this prong as follows:

> "Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 695-96, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2069.

In this case, the factual findings as stated in the first direct appeal (*Caballero*, 102 Ill. 2d 23) were not affected by that part of trial counsel's representation which defendant now argues was ineffective. Furthermore, defendant had confessed to the vicious multiple murders in graphic detail and without remorse. The defendant gave a detailed confession of his guilt, which was admitted at the trial. In this confession he told how he, together with three companions, abducted the three victims, who had claimed to know members of a rival gang. He also admitted in the confession that he personally stabbed and cut the throat of one of the victims. Extensive physical and forensic evidence corroborated many of the details of the confession. After defendant gave a statement, the assistant State's Attorney asked defendant if he had it to do over "would he do it again." The defendant stated that he would "if it was a sure thing." The assistant State's Attorney then

said, "There is no such thing as a sure thing. You got caught." Defendant replied, "Lots of Kings kill people without getting caught." The assistant State's Attorney again replied, "Well you got caught, Juan. Would you do it if you had it to do all over again?" The defendant replied, "I'd kill Michael for sure, but I don't know about the other two." The prosecution also introduced evidence that the defendant had made a less specific admission of guilt to a cellmate. The evidence the extra mitigating witnesses defendant produced at his post-conviction hearing would have provided could not have precluded the imposition of the death penalty.

Thus, this court finds that defendant was not prejudiced by trial counsel's performance and, as such, has failed to meet the second prong of the *Strickland* test.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 19, 1993, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1989, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution in which the defendant is confined.

*Affirmed.*