2022 IL App (1st) 181747-U

THIRD DIVISION
May 11, 2022

No. 1-18-1747

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| | ) | |
|     v. | ) | 79 C 1986 (02) |
| | ) | |
| JUAN CABALLERO, | ) | Honorable |
|     Petitioner-Appellant. | ) | Alfredo Maldonado, |
| | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Trial court properly denied 18-year-old defendant leave to file successive postconviction petition attacking life sentence, as petitioner could not establish the required element of cause.

¶ 2    In 1979, an 18-year-old Juan Caballero participated in the killing of three men in a Chicago alleyway. In his statement to police after he was arrested, he confessed to slitting the throat of one of the victims. Caballero was convicted and sentenced to death. In the 42 years since then, he has tried numerous times to attack his conviction and sentence. The only relief he has received so far is a gubernatorial grant of clemency, converting his death sentencing into one of life in prison without the chance of release.

¶ 3 In 2018, he sought leave to file a new postconviction petition—his seventh—and challenged his life sentence again. Using the seminal case of *Miller v. Alabama*, 567 U.S. 480 (2012), he alleged his life sentence violated the federal eighth amendment and the Illinois constitution's proportionate penalties clause. The trial court denied him leave to file his petition.

¶ 4 We affirm. Neither *Miller* nor the Illinois law that has come from it has created a new legal basis that this defendant can use to attack his sentence. The law has changed for juveniles sentenced to life in prison, but this defendant is an adult in the eyes of the law. And though our supreme court has suggested that emerging adults may be able to leverage *Miller* to help challenge their sentences, that suggestion is not tantamount to a substantial change in the law to allow the defendant to file a successive postconviction petition.

¶ 5                                    BACKGROUND

¶ 6 Five Illinois supreme court opinions summarize much of the history of this case, and we incorporate them by reference. *See People v. Caballero*, 102 Ill. 2d 23 (1984) (*Caballero I*); *People v. Caballero*, 126 Ill. 2d 248 (1989) (*Caballero II*); *People v. Caballero*, 152 Ill. 2d 347 (1992) (*Caballero III*); *People v. Caballero*, 179 Ill. 2d 205 (*Caballero IV*); and *People v. Caballero*, 206 Ill. 2d 65 (2002) (*Caballero V*). We summarize only the facts necessary to dispose of this appeal.

¶ 7 Defendant was convicted and originally sentenced to death for his role in the murder of three men: Michael Salcido, Arthur Salcido, and Frank Mussa.

¶ 8 At defendant's trial, the State introduced a statement he made to investigators the night he was arrested. Defendant denied making the statement and claimed he only signed it after two police officers beat him and threatened him with more beatings. The State's witnesses said that defendant confessed after the investigating officer told him Ruiz had already implicated him in

the murders.

¶ 9     In that statement, the defendant said that, in February 1979, he and three other fellow members of the Latin Kings gang—Luis Ruiz, Placido LaBoy, and Nelson Aviles—were on their way into a restaurant called King Castle when the Salcidos and Mussa were walking out. Michael Salcido approached Ruiz and asked him if he knew where they could buy some marijuana, and Ruiz said he didn't. Michael then asked Ruiz if he knew a man named Juan Cortez. Defendant, Ruiz, LaBoy, and Aviles knew Cortez was a member of the Latin Eagles, a rival to their gang, the Latin Kings. But they let Michael believe they, too, were members of the Eagles, like Cortez. Michael bragged about his connections to the Eagles and claimed he had driven a car during several "hits" against rival gangs.

¶ 10    The Salcidos and Mussa then agreed to go to an alleyway under the pretense they were going to make a drug deal with defendant and his friends. They got into the front seat of a car, while defendant, Ruiz, LaBoy, and Aviles got into the back. Once they arrived at the alley, the defendant and his co-offenders told Arthur Salcido and Frank Mussa to stay in the car while they walked down the alley with Michael Salcido. When they were out of sight, the men began to beat and kick Michael. While he was on the ground, they revealed they were really Latin Kings.

¶ 11    Defendant and Aviles stayed with Michael while Ruiz and LaBoy returned to the car. They drove it down the alleyway a few minutes later, LaBoy now behind the wheel, with Arthur and Frank still in the front seat. Ruiz was in the back. Defendant, Aviles, and Michael then got into the back of the car, and LaBoy drove them to another alley. While they were driving, the four Latin Kings conversed in Spanish (which their victims did not understand) and decided they had to kill the Salcidos and Mussa so they could not identify them.

¶ 12    When they stopped, Ruiz gave the defendant a gun. He and LaBoy walked Michael and

Frank down the alleyway and ordered them to lie face down in the snow. Defendant gave the gun to LaBoy and went back to the car to see what was happening. When he got there, he saw Aviles stabbing Arthur in the front seat of the car. The medical examiner later testified that Arthur had 18 neck wounds and eight chest wounds when he died.

¶ 13    Eventually, Frank was led back to the car; he was told to close his eyes and get in the front seat. When Frank did so, LaBoy told defendant to stab Frank, but defendant said that he would rather shoot him. LaBoy grabbed the knife from Aviles and began to stab Frank, with the defendant urging him to "slice his throat." Frank died of 21 stab wounds to the neck, jaw, chest, and back.

¶ 14    The defendant walked back to where Michael was still lying, face down in the snow. He led Michael to the car and told him to keep his eyes closed and get in the back seat. Michael opened his eyes, saw what happened to the others, and tried to fight back. Defendant then took the knife from LaBoy, grabbed Michael by his hair, and slashed his throat. Michael cried out "I'm dead, I'm dead, don't stab me," but defendant continued to stab him several times until he got tired. LaBoy also stabbed Michael several more times to make sure he was dead. In total, Michael had 24 stab wounds to his face and neck, five to his chest, and three to his back.

¶ 15    The jury found defendant guilty of all charges, and he was sentenced to death. Our supreme court affirmed his conviction and sentence on direct appeal. *Caballero I*, 102 Ill. 2d at 52.

¶ 16    Defendant filed several postconviction petitions over the years, including ones that challenged his sentence as disproportionate to the sentences that his codefendants received. None were successful. In 2003, then-Governor George Ryan commuted his death sentence into one of natural life with no chance of parole.

¶ 17    In 2018, defendant sought leave to file a seventh postconviction petition. In it, he alleged that his life sentence violated both the U.S. and Illinois constitutions. He argued that the U.S. Supreme Court's seminal decision in *Miller v. Alabama*, 567 U.S. 460 (2012), its progeny, the Illinois Supreme Court's decision in *People v. Leon Miller*, 202 Ill. 2d 328 (2002), and this court's decision in *People v. House*, 2015 IL App (1st) 110580, *vacated*, 111 N.E.3d 940 (Ill. 2018), required that he be given an opportunity to prove that his youth and individual characteristics were a major factor in the offense, such that his life sentence was unconstitutional.

¶ 18    Defendant argued that he was barely 18 at the time of the murders, under the influence of other gang members, and had a learning disability which made his mental capacity greatly reduced compared to a fully developed adult. The defendant attached six papers to the petition that discussed the neurological development of young adults and the role it plays in their executive functioning and propensity to commit criminal acts, as well as how their brain development improves the likelihood they can rehabilitate.

¶ 19    The circuit court denied defendant leave to file the petition. In a written order, the court ruled that *Miller* did not apply to the defendant because he was 18 years old at the time of his offense. The court further observed that the defendant was accountable for all three murders and played an active role in them. Last, the court said that *res judicata* barred the defendant from challenging his sentence, since he had previously challenged it in prior postconviction petitions.

¶ 20    Defendant now appeals.

¶ 21                                    ANALYSIS

¶ 22    This case finds us at the intersection of ever-evolving juvenile sentencing law and a defendant who was only a few months past his 18th birthday when he participated in the murders of the Salcidos and Mussa. In a series of cases involving the sentencing of juvenile offenders, the

U.S. Supreme Court has held that the eighth amendment to the United States Constitution forbids capital offenses for juveniles who commit murder (*Roper v. Simmons*, 543 U.S. 551, 578-79 (2005)), mandatory life sentences without the possibility of parole for juveniles who commit non-homicide offenses (*Graham v. Florida*, 560 U.S. 48, 82 (2010)), and mandatory life sentences without the possibility of parole for juveniles who commit murder (*Miller*, 567 U.S. at 489). These cases reflect society's evolving recognition that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471.

¶ 23    This has also raised questions about whether youthful offenders or emerging adults—that is, defendants who are young but legal adults, age 18 or over—should be afforded similar protections. Our supreme court has suggested that an emerging adult defendant sentenced to life in prison may be able to use *Miller*'s logic to attack his sentence under our state's proportionate-penalties clause (Ill. Const. 1970, art. I, §11). See *People v. Thompson*, 2015 IL 118151, ¶ 44; *People v. Harris*, 2018 IL 121932, ¶ 46; see also *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 28 ("In *Harris*, the court opened the door for an offender who was 18 or older to make an as-applied challenge under the proportionate penalties clause."); *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 27 ("The court has thus opened the door to the possibility that a young-adult offender might demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.'")

¶ 24    Against this backdrop, the defendant claims his mandatory life sentence violates both the federal eighth amendment and the Illinois proportionate-penalties clause. He seeks the opportunity, via successive postconviction proceedings, to develop a record to prove that his

sentence, as applied to him, violates those constitutional provisions. The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)) allows an incarcerated individual to collaterally attack their conviction and sentence by establishing there was a substantial denial of their constitutional rights in the trial or sentencing that resulted in their conviction. 725 ILCS 5/122-1(a)(1) (West 2018).

¶ 25 Defendant commences this attack in his seventh postconviction petition. The Act only allows a petitioner to file one petition without leave of the court. 725 ILCS 5/122(f) (West 2018). "Consequently, a defendant faces immense procedural default hurdles when bringing a successive postconviction petition." *People v. Davis*, 2014 IL 115595, ¶ 14. A petitioner may only file a successive petition if he demonstrates "cause for his or her failure to bring the claim" in his initial postconviction proceedings and prejudice that results from that failure. *Id.*, *People v. Pitsonbarger*, 205 Ill. 2d 444, 256 (2002). This is commonly known as the "cause-and-prejudice" test. *Id.*

¶ 26 "Cause" refers to some objective factor external to the defense that impeded the defendant's efforts to raise the claim in an earlier proceeding. *Davis*, 2014 IL 115595, ¶ 14. "Prejudice" refers to a claimed constitutional error that so infected the entire trial that the resulting conviction or sentence violates due process. *Id.* Both prongs must be satisfied for the defendant to prevail; if he fails on either, he may not file a successive postconviction petition. *People v. Guerrero*, 2012 IL 112020, ¶ 15.

¶ 27 A defendant can demonstrate "cause" if he shows that a new factual or legal basis exists that was not reasonably available to him when he filed his first petition. *See Pitsonbarger*, 205 Ill.2d at 460. A new substantive rule of law may constitute "cause" if it was not available earlier to the defendant, and it may constitute prejudice if it retroactively applies to him. *See Davis*,

2014 IL 115595, ¶ 42. "In other words, cause exists where a constitutional claim is so novel that its legal basis is not reasonably available to counsel at the time of the original procedural default." (Internal quotation marks omitted.) *People v. Sanders*, 393 Ill. App. 3d 152, 173 (2009). However, "the lack of precedent for a position differs from 'cause' for failing to raise an issue, and a defendant must raise the issue, even when the law is against him, in order to preserve it for review." *Guerrero*, 2012 IL 1122020, ¶ 20.

¶ 28    Defendant claims his petition satisfies the cause requirement because new case law, specifically *Miller*, were not available at the time he filed his initial position. In his opinion, these cases establish a new legal basis for an emerging adult to attack his mandatory life sentence. But for the reasons that follow, we find that he cannot establish cause on either claim.

¶ 29                                I. Proportionate Penalties

¶ 30    We begin with defendant's argument that his sentence violates the proportionate-penalties clause of our state constitution. That clause requires that all "penalties shall be determined both according to the seriousness of the offense and with the objective factor of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11.

¶ 31    Defendant says he has "cause" to raise this claim now because the legal underpinning for the challenge—namely, the decisions in *Miller* and *Harris*—did not exist when he filed his earlier petitions. Those decisions, in his mind, created a new substantive rule of law about the proportionate-penalties clause and emerging adults.

¶ 32    Since the filing of the parties' briefs in this matter, our supreme court has settled this issue, at least as to *Miller*. In *People v. Dorsey*, 2021 IL 123010, ¶ 74, our supreme court held that *Miller* did not provide "cause" for a successive postconviction petition review of a proportionate-penalties claim:

"*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause. [Citation.] As defendant acknowledges, Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' [Citation.]"

¶ 33 Thus, under *Dorsey*, the *Miller* decision did not provide "cause" for this successive postconviction challenge under the proportionate-penalties clause.

¶ 34 Nor did the supreme court's decision in *Harris*, 2018 IL 121932. True, as defendant points out, our supreme court noted there that a defendant could use postconviction proceedings to mount an as-applied challenge to a sentence based on proportionate penalties. See *id*. ¶¶ 41-47. There, the defendant had attempted to raise the claim on direct appeal, without having an adequate record to do so, prompting the court to remark that postconviction review would be the proper avenue for that defendant. *Id*.

¶ 35 It would certainly be a proper avenue for defendant here, too, but the difference is that in this case, we are not on direct appeal. We are at the stage of defendant's seventh postconviction petition. He could have raised this as-applied, proportionate penalties challenge on direct appeal, as well as in one of the sixth postconviction petitions he previously filed.

¶ 36 For example, in *Leon Miller*, 202 Ill. 2d 328, 340, our supreme court held that the law requiring a 15-year-old defendant to spend his life in prison without parole violated the proportionate penalties clause because it "effectively bars courts from considering the offender's degree of participation in the crime" and "does not allow a court to consider the age of the

offender or the offender's participation in the crime at the time of sentencing." Defendant here could have raised this claim in his first, second, third, fourth, fifth, or sixth postconviction petitions. (In fact, his fifth and sixth petitions were filled after the supreme court decided *Leon Miller*.)

¶ 37    Simply put, there is no new legal basis concerning the proportionate-penalties challenge that allows defendant to raise this particular claim for the first time in his seventh postconviction petition; as noted above, *Miller* did not provide that new basis but, rather, only provided "some helpful support" for a pre-existing claim. *Dorsey*, 2021 IL 123010, ¶ 74.

¶ 38    Defendant thus lacks "cause" for raising this claim for the first time at this late juncture. The circuit court properly denied defendant leave to file this claim.

¶ 39                              II. Eighth Amendment

¶ 40    Defendant likewise cannot use *Miller* to establish cause to raise his eighth-amendment challenge in his seventh postconviction petition, for the simple reason that *Miller* does not apply to defendant, who was 18 at the time of his crime. Though *Miller* certainly created a new substantive rule of law for *juveniles* to raise an eighth amendment challenge to their sentences (*Davis*, 2014 IL 115595, ¶ 42), our supreme court has rejected the idea that an adult can use *Miller* to attack his sentence on eighth amendment grounds: "[F]or sentencing purposes, the age of 18 makes the present line between juveniles and adults." *Harris*, 2018 IL 121932, ¶ 61; see also *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 31 (*Miller* does not apply to individuals 18 years or older); *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 37 (same); *People v. White*, 2020 IL App (5th) 170345, ¶ 20 (same).

¶ 41    Defendant attempts to differentiate his situation from that in *Harris* by arguing that his eighth amendment attack is an as-applied challenge, not a facial one. Unfortunately, that is

beside the point. Whatever the nature of the challenge defendant may bring, the question, first and foremost, is whether he has cause for asserting it at this late juncture. To do so, as noted, he must present a legal basis for his claim that did not previously exist. Defendant does not and cannot cite such a basis, as *Miller* clearly does not provide it.

¶ 42    The circuit court properly found that defendant did not establish cause to raise his eighth-amendment claim in his seventh postconviction petition.

¶ 43                                CONCLUSION

¶ 44    For the reasons given above, the trial court properly denied defendant leave to file this successive postconviction petition.

¶ 45    Affirmed.