(No. 88784.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JUAN CABALLERO, Appellant.

*Opinion filed October 18, 2002.*

RARICK, J., took no part.
KILBRIDE, J., dissenting.

Juliet Yackel, of Chicago, and Erika Cunliffe, of Cleveland Heights, Ohio, both of the Office of the State Appellate Defender, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

Jeffrey Urdangen, of Chicago (Sandra L. Babcock, of Minneapolis, Minnesota, of counsel), for *amicus curiae* United Mexican States.

JUSTICE GARMAN delivered the opinion of the court:

Late on a February night in 1979, three teenaged boys left an all-night diner in Chicago. On their way out of the restaurant, one of them approached a group of four others in an attempt to purchase marijuana. Not knowing that the four were members of the Latin Kings, he falsely claimed membership in a rival gang, the Latin Eagles. Before the night was over, the three were lured into an alley and murdered.

Three of the four killers, defendant, Luis Ruiz, and Placido LaBoy, were apprehended within days, but LaBoy was released after a preliminary hearing for lack of probable cause. Defendant and Ruiz were both tried, convicted, and sentenced to death. The fourth, Nelson Aviles, fled to California, where he was eventually arrested in 1988. He agreed to plead guilty and to testify against LaBoy, in return for a sentence of 40 years' imprisonment. The State unsuccessfully sought the death penalty for LaBoy, who received three consecutive natural life sentences.

This is the fifth occasion we have had to consider whether defendant was properly sentenced to death for his involvement in the brutal slayings of Michael Salcido, Arthur Salcido, and Frank Mussa. On direct appeal, this court affirmed his convictions of murder, armed violence, and unlawful restraint and the imposition of the death sentence. *People v. Caballero*, 102 Ill. 2d 23 (1984) (*Caballero I*). Following the circuit court's dismissal of defendant's first post-conviction petition, this court affirmed in part, reversed in part, and remanded for an evidentiary hearing on defendant's claim that trial counsel was ineffective for failing to properly prepare and present evidence in mitigation. *People v. Caballero*, 126 Ill. 2d 248 (1989) (*Caballero II*). On remand, the circuit court held the required hearing and again dismissed defen-

dant's claim. We affirmed. *People v. Caballero*, 152 Ill. 2d 347 (1992) (*Caballero III*). Defendant's second post-conviction petition claimed that his death sentence is unconstitutionally disproportionate to the sentences imposed on Aviles and LaBoy. The circuit court dismissed the petition without an evidentiary hearing. We rejected his claim as to Aviles, on the basis that Aviles' guilty plea justified the substantial disparity in their sentences. As to LaBoy, however, we reversed in part and remanded to the circuit court for a hearing. *People v. Caballero*, 179 Ill. 2d 205 (1997) (*Caballero IV*). The circuit court held the required hearing and rejected defendant's claim.

Defendant raises two claims in the present appeal: (1) his constitutional right to due process was violated because he did not receive a full and fair hearing before the circuit court on remand, and (2) his death sentence is unconstitutionally disproportionate to LaBoy's life sentences. In addition, we granted leave to the United Mexican States to submit a brief *amicus curiae*. 155 Ill. 2d R. 345. We affirm.

## I. BACKGROUND

### A. Caballero Trial and Sentencing

At defendant's trial, the State was permitted to introduce evidence of a statement made by defendant on the night of his arrest. Defendant denied making the statement, claiming that he was beaten by two police officers and threatened with more beatings if he did not sign a written statement that they placed in front of him. The State's witnesses testified that when defendant was told by the investigating officer that Ruiz had already made a statement implicating him, he gave his own version of the killings. He was advised of his rights and a court reporter took his statement, which he voluntarily signed.

Defendant's written statement said that he, Ruiz,

LaBoy, and Aviles were entering a restaurant called King Castle as three other young men were leaving. One of them, Michael, approached Ruiz and asked if he knew where they could buy some marijuana. After Ruiz said no, Michael asked if he knew Juan Cortez. The four were members of the Latin Kings and they knew that Cortez was a Latin Eagle, but they played along with Michael, letting him think that they were members of the same gang as Cortez. Michael bragged about his connections to the Latin Eagles and claimed to have driven the car during several "hits."

The three got into the front seat of their car, the four others got in the back seat, and they drove into a nearby alley on the pretense of making a drug deal. Arthur and Frank were told to stay in the car while the four walked down the alley with Michael. Once they were out of sight, they began to beat and kick Michael. When he was on the ground, they revealed that they were Latin Kings.

Defendant and Aviles stayed with Michael while Ruiz and LaBoy returned to the car. They came back a few minutes later, with the car. LaBoy was driving, with Arthur and Frank still in the front seat. Ruiz was in the back seat. Defendant, Aviles, and Michael got in the back seat and LaBoy drove to another alley. During this brief drive, the four conversed in Spanish and decided that they had to kill the three young men so that they could not identify them.

After they stopped, Ruiz handed defendant a gun. Defendant and LaBoy walked Michael and Frank down the alley and ordered them to lie facedown in a snowbank. Defendant gave the gun to LaBoy and told him to stay there while he went back to the car to see what was happening. When he got there, he saw Aviles repeatedly stabbing Arthur, who was in the right front seat of the car.

Dr. Robert Kirschner, the medical examiner, had testi-

fied earlier in the trial that Arthur was found in the front passenger seat of the car, with 18 neck wounds and eight chest wounds. The neck wounds severed both carotid arteries and both jugular veins as well as the trachea. He had no defensive wounds.

Ruiz told defendant to "go get the other guy." Frank was led back to the car and told to close his eyes and get in the left front seat. LaBoy told defendant to stab him, but defendant stated that he had never stabbed anyone and would rather shoot him. LaBoy grabbed the knife from Aviles and began stabbing Frank. Defendant stated, "I told him to slice his throat." Defendant then went back to where Michael was lying in the snow to watch him.

Kirschner testified that Frank was found in the driver's seat and died as a result of 21 stab wounds to the neck, jaw, chest, and back. He also had an incised wound of the face. He had no defensive wounds.

Finally, defendant led Michael back to the car and told him to keep his eyes closed and get in the back seat. Michael opened his eyes and, when he saw the others, began to resist. Defendant took the knife from LaBoy, grabbed Michael by his hair, and slashed his throat. He continued to stab Michael until he got tired. Michael yelled, "I'm dead. I'm dead. Don't stab me." Defendant stabbed him a few more times. LaBoy took the knife and stabbed him several more times, to make sure he was dead.

Kirschner's testimony was that Michael had multiple stab wounds, including 24 to the face and neck, 5 to the chest and abdomen, and 3 to the back. Michael had defensive wounds to the right hand and forearm. He was found in the back seat of the car.

Defendant said that Ruiz, LaBoy, and Aviles then took several pairs of socks from a suitcase they had found in the car, put the socks on their hands, and attempted

to wipe off any fingerprints they might have left. The police recovered two bloody socks near the scene, which were admitted into evidence. In addition, one fingerprint matching Ruiz was found on an outside rear window of the car. As they walked away, LaBoy discarded the knife in a snowbank. The four went to LaBoy's house to clean up. Ruiz stated that he had to return the gun he had been carrying to the person from whom he borrowed it. The others got in a cab to go home.

The assistant State's Attorney who questioned defendant testified that he read the transcribed statement, made some corrections, and signed it. The assistant State's Attorney asked defendant whether, if he had it to do over, he would do the same thing again. Defendant replied, "[I]f it was a sure thing." The assistant State's Attorney answered, "[T]here's no such thing as a sure thing. You got caught." Defendant's response was, "[A] lot of Kings kill people without getting caught. *** I'd kill Michael for sure, but I don't know about the other two."

Defendant agreed to return to the scene with the detectives and to point out where the knife had been discarded. They did not recover the knife at that time. A knife was discovered in a snowbank several days later by a passerby, who turned it over to the police. It had minute bloodstains that were insufficient to type or identify.

The jury returned a verdict of guilty on all charges and the sentencing stage began several days later. As to defendant's history of prior criminal activity, the State introduced evidence of defendant's prior conviction for unlawful use of a weapon in 1978, for which he received a sentence of probation. The jury also heard testimony that while in custody awaiting trial, defendant solicited another prisoner who was about to be released to put out a "hit" on the individual defendant suspected of informing the police of his involvement in the three murders.

## B. LaBoy Trial and Sentencing

Over a decade later, Aviles testified that he had been a 17-year-old gang member in 1979 when he and three older members of the Latin Kings—Caballero, Ruiz, and LaBoy—met three young men as they were leaving the King Castle restaurant, which was on Latin Eagle "turf." One of the young men said that he was looking for Juan Cortez because he wanted to buy some marijuana. Aviles and his companions knew that Cortez was the leader of the Latin Eagles. Ruiz told the boys that he knew where they could buy some "weed," but they needed a ride to get there. All seven got into the car, the three eventual victims in the front seat and the four Latin Kings in back. As they drove, Michael Salcido bragged about having done "a couple of hits on Latin Kings." Speaking in Spanish, Ruiz told Aviles and the others that they were going to "rob these guys." The three boys in the front seat did not react. None of them spoke Spanish.

Ruiz directed the driver to an alley. He stayed with Arthur and Frank at the car while Aviles, Caballero, and LaBoy took Michael around a corner, ostensibly to make the marijuana purchase. As soon as they were out of sight of the others, LaBoy "jumped on him" and started to beat him up. Michael fell to the ground and Aviles picked him up. Michael was "hysterical." He screamed that he was not an Eagle, that he had just wanted to be their friend. LaBoy yelled at him to shut up and continued to beat him. Eventually, they walked Michael back to the car. When the others saw Michael crying and beaten and asked what was going on, Ruiz pulled a gun. Aviles and the others began to rob the victims, taking their watches and the contents of their pockets. Michael told them to take whatever they wanted and promised that they would not go to the police. LaBoy struck him in the face and told him to shut up.

At that point, Ruiz said, in Spanish, that they had to kill the three boys. Aviles responded, still in Spanish,

that he thought they were only going to rob them. LaBoy said that the three had seen their faces, so they could not let them go, but he had a better way of dealing with it than Ruiz's gun. He pulled a knife, which he handed to Ruiz. Then he grabbed the boy who had been driving (Arthur) and shoved him into the front seat of the car on the passenger side. Caballero and LaBoy walked Michael and Frank down the alley. Ruiz called Aviles around to the other side of the car, handed him the knife, and told him to get in the car and "do the guy." Aviles hesitated, but Ruiz kept telling him to go ahead. Ruiz was pointing the gun at Arthur as Aviles stabbed him in the chest three or four times. When Arthur put his hands up as if to resist, Aviles panicked and dropped the knife. Then the passenger side door burst open and LaBoy grabbed the knife. He began stabbing Arthur, while screaming at Aviles for not "taking care of business." LaBoy grabbed Arthur by the head and slit his throat, telling Aviles, "This is how you do it." He sliced repeatedly at Arthur's throat and stabbed him in the chest several times. When he was done, he licked the blood from his hand as he told Aviles that he had "no heart" and that this was how a "true King takes care of business." Aviles told LaBoy that he "didn't want any part of this," so LaBoy sent him down the alley to act as a lookout.

As he walked down the alley, he saw Caballero, who had the other two boys on the ground in the snow. Aviles threw up in some bushes. Later, he saw LaBoy take "the guy that was doing all the talking" (Michael) back to the car and force him into the back seat. Michael begged him not to kill him, screaming that he was not an Eagle. LaBoy told him to shut up and started stabbing him.

Ruiz, LaBoy, and Caballero eventually motioned for Aviles to come back to the car. When he did, he saw that all three of the boys were dead, two in the front seat of the car and one in the back. LaBoy and Ruiz said that

they had to wipe the car down. LaBoy took the keys from the ignition and opened the trunk. He opened a suitcase he found inside and started passing out the socks they used to wipe the car of fingerprints. They threw the bloody socks into backyards along the alley as they walked away. LaBoy shoved the knife into a pile of snow. Ruiz left, and the others went to LaBoy's home.

The jury found LaBoy guilty. At the sentencing phase, the State argued that LaBoy was the most culpable of the four killers, and that he was responsible for all 24 stab wounds inflicted on Michael. Reflecting Aviles' testimony, the State's only mention of defendant was to describe him as aiding, abetting, or attempting to aid LaBoy.

## C. The Evidentiary Hearing

In *Caballero IV*, this court found that defendant had made "a substantial showing that his constitutional rights were violated so as to entitle him to an evidentiary hearing on the disparity between his death sentence and LaBoy's life sentence." *Caballero IV*, 179 Ill. 2d at 217, citing *People v. Gleckler*, 82 Ill. 2d 145, 166 (1980) (acknowledging "this court's duty to ensure that the cases in which death is imposed are rationally distinguished from those in which it is not imposed").

The evidence before the circuit court at the evidentiary hearing consisted of the transcripts of the trials and sentencing hearings of defendant and LaBoy. No additional testimony was presented. Defense counsel preceded her argument with a summary of the factors relevant in the analysis of sentencing disparity: the relative culpability of the offenders (*Gleckler*, 82 Ill. 2d at 166), their rehabilitative prospects (*Gleckler*, 82 Ill. 2d at 171), and their criminal histories (*Gleckler*, 82 Ill. 2d at 170-71). Defense counsel argued that defendant's only criminal record, prior to being found guilty of these three murders, was for unlawful possession of a weapon. He

received a sentence of probation. In contrast, after the murders at issue here, but before his trial, LaBoy was convicted of three major felonies, all involving armed violence, and one of which was the attempted aggravated sexual assault of a 16-year-old girl. Counsel also noted that defendant has been a model prisoner for 20 years, thus demonstrating his potential for rehabilitation, while LaBoy's subsequent actions show that he is unlikely to ever be rehabilitated. In addition, LaBoy took pleasure in the three murders, smiling and licking the blood from his fingers in a "particularly ghoulish" display that further demonstrated his lack of rehabilitative potential. As to the relative culpability of the two, counsel argued that it was LaBoy who initiated the beating of Michael and then rejected Ruiz's plan to use a gun and produced the knife. Defendant had "no role" in the killings of Arthur and Frank. He did stab Michael, but so did LaBoy. LaBoy also took the lead in the attempt to wipe down the car and dispose of the murder weapon. Counsel also pointed to the State's closing argument at LaBoy's trial that he was the principal in at least two of the killings while defendant was merely aiding and abetting. Defense counsel concluded that LaBoy was the "worst actor" under all three factors of the analysis.

The State responded that defendant was an "active and willing participant" in all three killings. He participated in the beating of Michael, took part in setting up the murder, encouraged LaBoy to use a knife instead of a gun, escorted two of the victims back to the car to their deaths, and actually killed one of them. Thus, he was not simply a follower or bystander.

The State also explained that the evidence presented in the two cases was slightly different. At defendant's trial, his own statement about his role in the events of that night was introduced into evidence. The statement was not admitted in the LaBoy trial. Aviles' testimony

was the linchpin of the State's case against LaBoy, but Aviles' perspective was slightly different from defendant's and, as a result, different facts were emphasized. For example, because Aviles walked away from the scene for awhile, he did not observe some of the events that defendant described. Aviles portrayed LaBoy as the ringleader, while defendant's version suggested that he, Ruiz, and LaBoy were equals in this regard.

The State argued that defendant is the "most culpable" of the four killers because he took a "more active role" in setting up the murders. He forced two of the victims to lie facedown in the snow while they waited to be taken back to the car where they were murdered. He urged LaBoy to slice Frank's throat and "savagely murdered" Michael. Ruiz may have come up with the initial plan or, perhaps, "was the first to speak it aloud," but defendant "kept it going." As to rehabilitative potential, the State acknowledged that LaBoy had been convicted of several violent felonies during the years it took to bring him to trial for these killings and that these convictions demonstrated his lack of potential. However, defendant's own words and actions demonstrated his lack of rehabilitative potential. He showed no remorse and stated that he would kill again if it were a sure thing. He tried to arrange for another murder from his jail cell. In conclusion, the State argued that both defendant and LaBoy should have received the death penalty; however, just because one or more of the LaBoy jurors were not convinced of this, defendant's death sentence is not rendered unconstitutional.

Defense counsel pointed out that, at each trial, the prosecutor argued that the person on trial was the most culpable. Such conduct by the prosecutors, counsel argued, is "scandalous." The State responded that such argument is merely advocacy.

At the conclusion of the evidentiary hearing, the

circuit court found that: (1) defendant was "as involved" as LaBoy and was an active and willing participant in the killings; (2) LaBoy had a more significant criminal history "at the time of their respective sentencings" than did defendant; and (3) at the time he was sentenced, defendant was "a ruthless killer who exhibited absolutely no remorse for his crime and, in fact, indicated that he would do it again if he could get away with it," revealing that his potential for rehabilitation was "absolutely none." Therefore, the circuit court ruled, defendant's death sentence was not unconstitutionally disparate from LaBoy's life sentences.

## II. DUE PROCESS

Defendant asserts that he was denied a full and fair evidentiary hearing before the circuit court, in violation of his constitutional right to due process. Specifically, he claims that the State argued before the LaBoy jury that LaBoy was the most culpable of the four killers while defendant was "aiding and abetting, [and] attempting to aid," and then, at the evidentiary hearing, argued that defendant was the more active participant in the killings and that LaBoy's conduct was peripheral. According to defendant, the State's characterization of his role in the killings "contradicted the theory" the State advanced at LaBoy's trial and was "incompatible with the evidence presented there." He further claims that he was prejudiced because the circuit court accepted the State's characterization of his actions as more blameworthy than LaBoy's. Defendant's brief describes the State's conduct as "cho[osing] to misrepresent the facts."

In its brief, the State concedes that the comments made about defendant's culpability during closing argument at the LaBoy trial, which minimized defendant's involvement in the killings, were inaccurate, but were "nothing more than a passing reference" and "not a declaration of defendant's role in the murders." Further,

because defendant's role in the killings was established by his 1979 confession and LaBoy's role was established by Aviles' 1992 testimony, minor discrepancies between the two accounts are to be expected.

The State further acknowledges that it made a "mistake" at the evidentiary hearing by arguing that defendant is the *most* culpable of the four killers. Because this was argument to the bench, rather than an assertion of fact, and because the court had access to the transcripts of both trials, the State now argues that the mistake did not prejudice defendant.

The State's current position is that defendant and LaBoy are equally culpable in the three killings and that the death penalty would be appropriate for both. Although one or more members of the LaBoy jury chose to reject the death penalty, defendant's role as an active participant in the killings justifies the imposition of the death penalty. With regard to rehabilitative potential, the State's brief postulates that defendant's prospects for rehabilitation were "dismal" at the time he was sentenced and that LaBoy's were "no better." During oral argument, however, the State argued that defendant's potential for rehabilitation is less than LaBoy's because LaBoy expressed remorse for the killings while defendant was "cold-hearted" and stated that he would do the same thing again if he thought he could get by with it. The State also suggests that their criminal records are not subject to comparison because, while LaBoy was at large committing several felonies, defendant was on death row where he had "no further opportunity to offend."

Defendant's due process argument rests on the State's changing positions on the issues of culpability and rehabilitative prospects. Defendant claims that if the State "had stayed true" to the position argued to the LaBoy jury—that LaBoy is the most culpable—defendant would have prevailed before the circuit court on his

sentencing-disparity claim. In addition, defendant argues that the State has admitted LaBoy's prospects for rehabilitation are "no better" than his and asks this court to "hold them to that." At oral argument, defense counsel characterized the State's conduct as "playing fast and loose" with the court. The effect of the State's arguing "a theory of culpability that [the prosecutor] knew was invalidated by evidence his office had stood by in the past" was to make the evidentiary hearing "fundamentally unfair."

Defendant does not suggest what remedy would be appropriate if this court were to agree with his due process claim. His use of the expression "playing 'fast and loose' " sounds in the doctrine of judicial estoppel, which "provides that a party who assumes a particular position in a legal proceeding is estopped from assuming a contrary position in a subsequent legal proceeding." *Bidani v. Lewis*, 285 Ill. App. 3d 545, 549 (1996) (commenting that the doctrine " 'estops a party from playing "fast and loose" with the court' "). The doctrine of judicial estoppel rests not upon due process concerns, but "upon public policy which upholds the sanctity of the oath and its purpose is to bar as evidence statements and declarations which would be contrary to sworn testimony the party has given in the same or previous judicial proceedings." *Bidani*, 285 Ill. App. 3d at 549. Five elements are generally required for the doctrine of judicial estoppel to apply: the party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it. *People v. Coffin*, 305 Ill. App. 3d 595, 598 (1999). Application of the doctrine is within the discretion of the court. *Bidani*, 285 Ill. App. 3d at 550.

This court has rarely, if ever, had occasion to consider the doctrine, but our appellate court has done so in the context of criminal proceedings. See *Coffin*, 305 Ill. App. 3d at 598 (holding that the State is not estopped from using results of a blood-alcohol test performed on blood sample obtained in a hospital emergency room to prosecute the defendant for DUI, even though the State previously used defendant's refusal to submit to a blood-alcohol test to obtain summary suspension of driver's license; the positions taken by the State were not factually inconsistent); *People v. Gayfield*, 261 Ill. App. 3d 379, 386 (1994) (holding that the State did not take contradictory positions in two proceedings where, in the first proceeding, Jones pleaded guilty to murder and identified Cooks as the shooter and, in the second proceeding, the State charged Gayfield with the murder and identified him as the shooter); *People v. Wisbrock*, 223 Ill. App. 3d 173, 175 (1991) (holding the State estopped from using results of breathalyzer test in DUI prosecution when it had previously taken the position that defendant refused to take the test in proceeding to obtain summary suspension of his driver's license).

The doctrine of judicial estoppel does not apply in the present case because the disputed statements by the State regarding relative culpability and rehabilitative prospects were matters of opinion, not of fact. Thus, despite invoking the familiar "fast and loose" mantra of judicial estoppel, defendant argues that his right to due process is violated when the State is allowed to offer argument that contradicts its earlier argument on the same issue. Defendant cites two cases in support of his claim that the State's shifting positions on the questions of relative culpability and potential for rehabilitation violate the due process clause. The State attempts to distinguish both cases on the basis that they involve the guilt phase of trial, not disparity of sentencing.

In *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2000), the Eighth Circuit Court of Appeals considered "whether the Due Process Clause forbids a state from using inconsistent, irreconcilable theories to secure convictions against two or more defendants in prosecutions for the same offenses arising out of the same event." Four juveniles were involved in the robbery and murders at issue in *Smith*. One of them, Lytle, gave two conflicting versions of the killings. The State used one version to convict Smith and the other version to convict Bowman. The court held that the State's "use of inherently factually contradictory theories violates the principles of due process." *Smith*, 205 F.3d at 1052.

In *Thompson v. Calderon*, 120 F.3d 1045, 1056 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 538, 140 L. Ed. 2d 720, 118 S. Ct. 1489 (1998), the circuit court of appeals found "glaring inconsistenc[ies] between the prosecutor's theories, arguments, and factual representations" at the separate trials of the two defendants. "The prosecutor manipulated evidence and witnesses, argued inconsistent motives, and at [the trial of the second defendant] essentially ridiculed the theory he had used to obtain a conviction and death sentence [at the trial of the first defendant]." *Thompson*, 120 F.3d at 1057. The State's conduct in this case violated the "bedrock principle[ ]" that "when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." *Thompson*, 120 F.3d at 1058.

We agree with the State that no due process violation occurred. First, the State has not offered "inconsistent theories and facts regarding the same crime" (*Thompson*, 120 F.3d at 1058). Rather, at defendant's trial, the State used his own statement as the basis for its argument to the jury that he deserved the death penalty. At LaBoy's

trial, the State used Aviles' testimony, which contained more detail about LaBoy's conduct than defendant's earlier statement, to argue that LaBoy deserved the death penalty. As the *Smith* court noted, "the passage of time between trials *** may be a legitimate excuse for minor variations in testimony or defects in memory ***." *Smith*, 205 F.3d at 1052. At the evidentiary hearing and before this court, the State has not argued inconsistent facts. Instead, it has merely made different arguments from those facts.

Our own research has identified the case of *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000), in which the defendant was sentenced to death while his co-offender was given a life sentence. Both men shot at the victim during an armed robbery, but it was impossible to determine which gun caused the fatal wound. The prosecutor argued at both trials that the defendant on trial was the killer. Citing *Smith*, the court determined that there was no due process violation where the prosecutor made inconsistent arguments at the two trials, but did not use evidence that was "factually inconsistent and irreconcilable." *Paul*, 217 F.3d at 998.

Similarly, in *Drake v. Francis*, 727 F.2d 990 (11th Cir. 1984), the State's arguments at the trials of two defendants varied only with regard to the extent of their involvement in the murder. In the first case, the prosecutor argued that the defendant was the sole murderer. In the second case, the prosecutor argued that the first defendant had been too weak to commit the crime alone and that, therefore, the second defendant must have participated in the fatal attack. *Drake*, 727 F.2d at 994. Both were convicted and sentenced to death. The court of appeals found that the two theories were "fairly consistent" and that there was no due process violation. *Drake*, 727 F.2d at 994.

These cases stand for the proposition that a party is

not as bound by his prior arguments as he is by prior assertions of fact. We conclude that no due process violation has occurred in the present case when the State's shifting positions involved matters of opinion, not of underlying fact. We, therefore, decline to hold the State to the argument it made to the LaBoy jury that he is the most culpable of the four killers. That argument was permissible in the context of the LaBoy trial and supported by the evidence presented to that jury. In this proceeding, however, the purpose is the direct comparison of the relative culpability of defendant and LaBoy. We do not find it necessary to constrain the State's argument on this issue.

We do, however, hold the State to its position that, at the time of sentencing, defendant and LaBoy had equally "dismal" prospects for rehabilitation, because the State has asserted this argument in its brief before this court. We will not consider counsel's remark at oral argument that defendant's prospects were "worse" because, unlike LaBoy, he did not express remorse for the murders.

Defendant also argues his right to due process will be violated by allowing the State to base its relative-culpability argument on the record of his own trial, because the factual discrepancies between defendant's "purported" confession and Aviles' testimony cannot be reconciled. As an initial matter, we reject the implication that defendant's statement should be considered less reliable than Aviles' because it allegedly was not voluntary. At defendant's trial, the court rejected defendant's claim of coercion and this court affirmed that ruling on appeal. *Caballero I*, 102 Ill. 2d at 33-37. Because the relative culpability of defendant and LaBoy must be determined by a comparison of their roles in the murders, we have examined both transcripts in depth to ascertain the extent and significance of the discrepancies.

Defendant's statement described their stopping the

car twice, in two different alleys. The beating of Michael took place at the first location and the killings at the second. Aviles did not mention getting back in the car and moving to another alley after the beating. In their descriptions of the beating, defendant had all four Kings participating, while Aviles made LaBoy primarily responsible.

Both defendant and Aviles testified that defendant and LaBoy took Frank and Michael down the alley to guard them while Arthur was killed. Aviles noted that, at that point, Ruiz had already pulled a gun and LaBoy had produced a knife. Aviles said that Ruiz gave the knife to him and he began to stab Arthur while Ruiz held the gun on them both. According to defendant's version, Ruiz could not have been holding the gun on Aviles, because defendant took the gun with him when he and LaBoy went down the alley. Defendant also said that he gave the gun to LaBoy and left him to guard Frank and Michael. Defendant walked back to the car in time to see Aviles stabbing Arthur.

The two versions differ at this point because Aviles stated that LaBoy returned to the car, took the knife from him, and began stabbing Arthur. According to Aviles, LaBoy licked blood from his fingers and bragged about how a King takes care of business, details that were clearly intended to portray to the LaBoy jury that he was the ringleader and the most culpable of the four. Aviles did not mention defendant's returning to the car. If, however, both defendant and LaBoy were at the car to see Aviles stabbing Arthur, no one was guarding Frank and Michael.

Defendant said that Ruiz told him to go get Frank. He brought Frank back to the car and LaBoy told defendant to stab him. When defendant hesitated, LaBoy took the knife from Aviles and began to stab Frank. Thus, in both accounts, LaBoy took the knife from Aviles,

but they differ as to whether he used it to stab Arthur or Frank. Defendant admitting telling LaBoy to slice Frank's throat before he went back to watch Michael.

Aviles, however, testified that after Arthur's killing, he was sent down the alley to act as a lookout; he did not see Frank being stabbed. Aviles claimed to have seen defendant still guarding Frank and Michael in the alley, which conflicts with defendant's description of his coming back to the car while Aviles was still stabbing Arthur and leaving LaBoy to stand guard.

Aviles also testified that he saw LaBoy take Michael back to the car, force him into the back seat, and stab him. Defendant said that he was the one who led Michael to the car, took the knife from LaBoy, slashed Michael's throat, and began stabbing him. Only when he tired did LaBoy take the knife back and stab him some more.

The State attributes any factual discrepancies in the two accounts to the passage of time and the fact that Aviles did not see everything that happened, because he went down the alley during the second killing.

We recognize that the two accounts differ somewhat. It is not certain whether LaBoy stabbed all three of the victims, or only two. LaBoy did apparently take the knife away from one of the others and continue to stab an already wounded victim, either taking the knife from Aviles to stab Arthur or taking the knife from defendant to stab Michael. Defendant and Aviles also gave differing accounts of who was at the car at various times and who held the gun. We reject, however, the suggestion that Aviles' testimony exculpates defendant. More than a decade passed between the events in the alley and LaBoy's trial. Memories fade. Aviles certainly told a version that implicated himself as little as possible. In addition, the State's purpose at the LaBoy trial was to elicit testimony from Aviles that fully described LaBoy's role in the killings, not the roles of Ruiz and defendant.

Aviles' focus on LaBoy's conduct does not provide a basis for concluding anything about defendant's conduct that night.

In another case that involved a substantial delay between the trials of the two codefendants, the defendant in *People v. Thompkins*, 161 Ill. 2d 148, 184 (1994), was convicted and sentenced to death in 1982. His codefendant, Moore, was not tried until 1986. In his post-conviction proceeding, Thompkins argued that the testimony presented at Moore's trial established that Moore played a more significant role in the two murders of which they were both convicted. We rejected Thompkin's claim, finding that "[a]lthough the testimony presented at Moore's trial provides a more complete picture of Moore's participation in these offenses, that evidence does not detract from the earlier depiction at the defendant's trial of defendant's own involvement in the crimes." *Thompkins*, 161 Ill. 2d at 184. The same can be said of the present case.

In sum, we find no irreconcilable contradictions between the factual accounts offered by the State at the two trials that could be said to affect defendant's due process rights. Therefore, there is no need to limit the State's argument to the evidence presented at LaBoy's trial.

### III. DISPARITY OF SENTENCES

The defendant argues, and the State does not dispute, that *de novo* review is appropriate in a post-conviction case in which no new evidence was presented at the evidentiary hearing that would require the circuit court to assess the credibility of witnesses. Therefore, because the circuit court only examined the records of the two trials and heard argument on behalf of each party, defendant urges this court to review the matter *de novo*.

No decision of this court has discussed the applicable standard of review in such a situation. The *de novo*

standard of review is applicable when the issue presented is purely a question of law. *People v. Chapman*, 194 Ill. 2d 186, 217 (2000) (stating that *de novo* review is appropriate when there are no factual or credibility disputes and the appeal, therefore, "involves a pure question of law"); see also *People v. Hall*, 195 Ill. 2d 1, 21 (2000) (stating that *de novo* review is applicable to questions of statutory interpretation or other questions of law). In *Hall*, the defendant urged *de novo* review because the rulings at issue "involved no fact-finding based on the demeanor or credibility of the witnesses because the evidence was written." *Hall*, 195 Ill. 2d at 21. We rejected this argument because the issue presented, whether certain evidence should have been admitted at trial, was not a pure question of law. Some deference was due to the trial court's rulings because "the trial court exercised discretion ***, *i.e.*, the court based these rulings on the specific circumstances of this case and not on a broadly applicable rule." *Hall*, 195 Ill. 2d at 21.

Although the circuit court in the present case heard no new evidence and credibility of witnesses was not a concern, the circuit court did have to weigh the facts and make inferences therefrom in order to rule on "the specific circumstances of this case." Nevertheless, we will apply a *de novo* standard of review because the circuit court had no special expertise or familiarity with the 1979 trial of defendant or the 1992 trial of LaBoy that would make it more capable than this court of weighing the facts presented by the written record and drawing necessary inferences.

Comparative proportionality review in capital cases is not required by either the United States Constitution or the Illinois death penalty statute. Thus, we will not compare the sentence received by one individual to sentences received by other persons convicted of similar crimes. This court does, however, have a constitutional

duty to determine whether the death penalty has been imposed arbitrarily or capriciously, or is unduly severe, considering the circumstances of the offense and the character and rehabilitative prospects of the defendant. To guarantee the individualized sentencing required by the eighth amendment, this court will consider whether a defendant's death sentence is disproportionately harsh in comparison to a lesser sentence imposed on a codefendant or accomplice convicted of the same crime. *People v. Williams*, 192 Ill. 2d 548, 576 (2000).

> "In reviewing a death sentence, we examine the facts of the particular case and the evidence introduced at the guilt and sentencing phases of trial. The relevant factors in comparative proportionality review include the offenders' extent of involvement in the offense, the nature of the offense, the character and background of the offenders, including any criminal record, and their potential for rehabilitation. Similarly situated individuals must not receive arbitrary or unreasonably disparate sentences." *Williams*, 192 Ill. 2d at 576.

Applying these factors, defendant claims that LaBoy is more culpable than he, has a worse criminal record, and has similarly poor rehabilitative prospects. Thus, he argues, his death sentence must be vacated. The State responds that defendant is "no less" culpable than LaBoy, his rehabilitative prospects are "no better" than LaBoy's, and their criminal histories are not comparable because defendant was already on death row, with no opportunity to commit further crimes, while LaBoy was at large, committing three subsequent violent felonies. The State argues that the leniency of the LaBoy jury does not render defendant's death sentence unconstitutionally disproportionate to LaBoy's life sentence. We shall discuss each of the three factors in turn.

## A. Rehabilitative Potential

Defendant formulates the question of rehabilitative potential as whether the potential for rehabilitation of

the person who received the more severe sentence is "demonstrably poorer" than that of his co-offender, citing *Gleckler*, 82 Ill. 2d at 171, in which the defendant's death sentence was vacated because he had "no criminal history, the personality of a doormat, and a problem with alcohol, was not the ringleader \*\*\*; nor [were] his rehabilitative prospects *demonstrably poorer*" (emphasis added) than those of his codefendants who received prison terms.

In a subsequent case, after finding the death penalty excessive, we discussed, in *dicta*, the factors relevant to the analysis of disparate sentences for codefendants. We found the defendant's rehabilitative prospects "not *demonstrably poorer* than those of her codefendants who received terms of imprisonment." (Emphasis added.) *People v. Smith*, 177 Ill. 2d 53, 103 (1997), citing *Gleckler*, 82 Ill. 2d at 171.

Based on our use of the phrase "demonstrably poorer" in such cases, the defendant argues that his death sentence cannot stand because his prospects for rehabilitation are not demonstrably poorer than LaBoy's. We reject defendant's argument. In the past, we have not used the phrase "demonstrably poorer" in *Gleckler* and its progeny to mean that the death penalty is precluded unless the defendant's rehabilitative prospects are found to be demonstrably poorer than those of his codefendant. Rather, we have stated that the comparison of rehabilitative potentials "is only one factor we consider in determining whether a defendant's capital sentence is disproportionate to his codefendant's sentence." *People v. Emerson*, 189 Ill. 2d 436, 498 (2000). In *Emerson*, although the defendant's behavior in prison suggested that his potential for rehabilitation was greater than that of his brother, the codefendant, we did not conclude that his death sentence was unconstitutionally disparate to his brother's prison sentence. *Emerson*, 189 Ill. 2d at

498. Thus, while a defendant's demonstrably poorer rehabilitative potential may explain his being sentenced to death while a codefendant receives a prison sentence, codefendants with similar prospects for rehabilitation need not necessarily receive the same sentence.

The parties agree that LaBoy's potential for rehabilitation is nil. The State's claim that defendant's prospects are "no better" than LaBoy's relies on his lack of remorse for the killings, evidence that he solicited another prisoner to put out "a hit" on a person he suspected of informing on him, and his statement that he would have killed Michael again if he could have gotten away with it.

Defendant counters that he has been a model prisoner for the past 20 years and that it is "wrong" to use the "mere words of an eighteen-year-old boy as justification for his execution twenty years later." Defendant's arguments point to one of the conditions making the disparity analysis so difficult in this case—the lapse of over a decade between his trial and LaBoy's. In 1979, the death sentence was given to an 18-year-old confessed, remorseless killer, who revealed not only a willingness, but an eagerness, to kill again. In 1992, a killer in his thirties, whose life history demonstrated absolutely no likelihood that he could ever be rehabilitated, received three consecutive life sentences for the same crimes. We conclude that neither defendant nor LaBoy, at the time of their respective trials and sentencing, revealed any likelihood of rehabilitation.

### B. Criminal History

Defendant argues that LaBoy's criminal history at the time of sentencing was "more substantial and violent" than his own. In addition, defendant points to the lack of evidence of any misconduct on his part during 20 years in prison. The State responds that defendant had no further opportunity to commit crime after he was placed on death row.

We accept defendant's suggestion that the mere fact of incarceration does not necessarily prevent one from committing further offenses. See *People v. Moss*, 205 Ill. 2d 139, 172 (2001) (finding defendant's poor adjustment to incarceration "as evidenced by his possession of weapons and his receipt of 44 disciplinary tickets while in prison" relevant to the comparison of criminal records of the codefendants); *Emerson*, 189 Ill. 2d at 498 (noting that codefendant's prison record over four years shows "repeated disciplinary violations involving violence, including possession of a weapon, attacking prison staff members, and fighting").

Nevertheless, it is difficult to compare the criminal histories of defendant and LaBoy when they were tried over a decade apart. Although LaBoy's three felonies are certainly more significant than defendant's single misdemeanor conviction, defendant is, in effect, suggesting that one offender may not be sentenced to death as long as one or more of his co-offenders are at large and may be committing further crimes.

In addition, even if there had not been a lengthy interval during which defendant was in prison while LaBoy was engaging in further crimes, the criminal history factor is not determinative. See *People v. Caffey*, 205 Ill. 2d 52, 134 (2001) (affirming death penalty where codefendant's criminal record was "quantitatively more severe than defendant's" but defendant's participation in the multiple homicides was "not significantly less" than that of the codefendant).

We conclude that this factor may weigh slightly in defendant's favor, but because of the unusual circumstances of the timing of the two trials, it is the least meaningful of the three factors that we must consider.

### C. Relative Culpability

Defendant claims that, first, he may not be sentenced to death unless he is shown to be more culpable than his

codefendant who did not receive the death penalty, and, second, because LaBoy was clearly the leader of the four, it would be impossible for defendant to have played a greater role in the murders than he. We find no support in the case law for the proposition that a defendant may be sentenced to death only if he is more culpable than his codefendant who receives a prison sentence. As we have noted above, the codefendants' relative culpability is but one factor of three to be considered.

In support of his assertion that LaBoy is more culpable, defendant argues that LaBoy was the "primary actor in two of the three killings"; he produced the knife and suggested that it be used instead of Ruiz's gun; he was, at age 23, the oldest of the four; and he directed the others in wiping down the fingerprints and disposing of the weapon and other evidence. In addition, defendant points to LaBoy's words and actions that evinced his enthusiasm for the act of killing.

The State does not argue that defendant is more culpable than LaBoy. Instead, the State argues that defendant is no less culpable than LaBoy because he was an active participant, not a mere follower. He guarded Frank and Michael while Arthur was killed. He did not refuse to kill Frank, he merely demurred because he wanted to use a gun instead of a knife. When LaBoy did attack Frank with the knife, defendant urged him to slice the boy's throat. Finally, when Michael was the only one left alive, defendant sliced his throat and then stabbed him until he was too tired to stab any more. Defendant's own account of the killings reveals that he was not merely following LaBoy's lead.

When we consider relative culpability, our purpose is to ensure that a passive participant, who may have had a less blameworthy mental state or whose conduct caused less harm, does not receive the ultimate penalty while an active participant, with a more culpable mental state or

who caused the greater harm, serves a prison sentence. Thus, evidence that a defendant was a follower, rather than a leader, in the commission of the crime has been held to be a significant factor in the analysis of disparate sentences. *People v. Jackson*, 145 Ill. 2d 43, 125 (1991), citing *Gleckler*, 82 Ill. 2d at 171. In *Gleckler*, for example, the defendant's death sentence was vacated, in part, because he was less culpable than his companion who forced the victims off the road, ordered them from their car, and shot them, after which he ordered Gleckler, who had "the personality of a doormat," to shoot the victims again. *Gleckler*, 82 Ill. 2d at 152-53, 171.

In contrast, there is no evidence in the present case that defendant's mental state was any less blameworthy than LaBoy's. Defendant did not act under any sort of compulsion nor was he a less than willing participant in the three murders. As for the harm done, the attacks on Arthur, Michael, and Frank were so savage and brutal that it is impossible to say that LaBoy is more responsible for their deaths simply because he may have inflicted more wounds than defendant.

This case bears many similarities to *People v. Kitchen*, 159 Ill. 2d 1 (1994). Kitchen and Reeves were both convicted of the murders of two women and their three children. Kitchen, who was 22 years old, received the death penalty, while Reeves, age 29, received a sentence of natural life in prison. Kitchen argued that his death penalty should be vacated because Reeves was more culpable: Reeves was also convicted of five counts of aggravated arson; he was older and the ringleader; the State argued at Reeves's trial that he was the more culpable of the two; and he had been found eligible for the death penalty on two separate bases. *Kitchen*, 159 Ill. 2d at 43. In rejecting Kitchen's claim that he was less culpable, we noted that he had admitted to at least two other persons that he actually participated in the killings

and said that, if necessary, he would do so again. Although he claimed in his statement to the police that he was a mere bystander while Reeves committed the murders, we did not credit his attempt to shift the blame to Reeves, and distinguished this case from *Gleckler* and others in which there were circumstances that mitigated the culpability of the defendant. *Kitchen*, 159 Ill. 2d at 45-46. In effect, we found that Kitchen's mental state and his participation in the killings were no less blameworthy than Reeves'.

Defendant has also attempted to shift blame to his codefendant, but his own statement reveals his mental state and his actions to be as blameworthy as LaBoy's. We find that defendant is no less culpable than LaBoy for these killings.

### D. Analysis of Three Factors

In sum, we have found that defendant and LaBoy are equally culpable for these crimes, neither showed any prospects for rehabilitation at the time of his conviction and sentencing, and although LaBoy has a more significant criminal record, this factor carries little weight because of the long delay between the two trials. Considering the cumulative effect of all three factors, we are left with the impression that they weigh more or less equally.

Defendant argues that, all things being equal, his death sentence cannot stand because executing him while imprisoning LaBoy for life would violate the eighth amendment prohibition against arbitrary and capricious sentencing, citing *Gregg v. Georgia*, 428 U.S. 153, 188, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932 (1976), and *Jackson*, 145 Ill. 2d at 119 (holding that an unreasonable disparity between the sentences of similarly situated codefendants violates the United States and Illinois Constitutions). Defendant reminds us of the words of Justice Stewart who, writing for the plurality in *Wood-*

*son v. North Carolina*, 428 U.S. 280, 305, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976), said that "[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." Defendant asserts that he is "no more deserving" of the death penalty than LaBoy and, thus, this court should vacate his sentence.

The State argues that, all things being equal, it is not a violation of the constitution for one defendant to receive the death penalty while his codefendant receives a life sentence. Merely because one or more members of the LaBoy jury chose not to impose the death penalty does not render defendant's sentence unconstitutionally disproportionate.

"Arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible." *Caballero IV*, 179 Ill. 2d at 216. However, a disparity in the sentences of similarly situated codefendants does not, by itself, show a violation of fundamental fairness. *Caballero IV*, 179 Ill. 2d at 216. Although the State cites no authority for its statement about the effect of two separate juries reaching different conclusions about the death penalty, we have made similar statements in the past. See *People v. Jimerson*, 127 Ill. 2d 12, 54-55 (1989); *Kitchen*, 159 Ill. 2d at 46. These statements reflect our understanding that sentences may be disparate without being unreasonably so. We are reading a cold record, many years after the trial. We did not hear the witnesses or observe the defendants in court. We do not know what considerations influenced one jury to recommend a sentence of death and one not. We cannot say, however, given the very slight differences between the two, that the different sentences were imposed arbitrarily or unreasonably.

We, therefore, affirm the circuit court's judgment dismissing defendant's post-conviction petition. We do

not find his sentence unconstitutionally disparate as compared to LaBoy's three consecutive life sentences.

Defendant has also suggested that his sentence is fundamentally unfair because he is the only one of the four to face the death penalty. Aviles pleaded guilty in return for a sentence of 40 years. LaBoy will serve natural life. Ruiz, who was originally sentenced to death, has been granted a new sentencing hearing, based on ineffective assistance of counsel. *People v. Ruiz*, 177 Ill. 2d 368 (1997). Defendant also points to the circuit court's subsequent granting of Ruiz's motion to bar the State from seeking the death penalty in light of LaBoy's life sentence for the same crimes. This court, however, reversed and remanded for a capital sentencing hearing because it "would be premature to compare a sentence of death in his case with the sentences received by LaBoy." *People v. Ruiz*, 194 Ill. 2d 454, 464 (2000). Similarly, it is premature to compare defendant's death sentence with a sentence not yet determined for Ruiz.

## IV. INTERNATIONAL LAW

Although the transcript of defendant's trial reveals that his mother testified he was born in Mexico, the question of his citizenship was not raised. The brief *amicus curiae* of the United Mexican States (Mexico) now informs this court that defendant is a citizen of Mexico and that he is the only one of the four perpetrators who is not a United States citizen. The *amicus* brief also states, inaccurately, that defendant is the youngest of the four killers. In fact, Aviles was 17 at the time of the killings; defendant was 18. They were not the youngest persons present. Frank and Michael were 16 and 17.

Mexico asserts that defendant has been denied certain protections under international law and that he is entitled to a remedy for these alleged violations. Specifically, Mexico claims that defendant's death sentence violates the Convention for the Elimination of

All Forms of Racial Discrimination (Convention) (International Convention on the Elimination of All Forms of Racial Discrimination, opened for signature March 7, 1966, 660 U.N.T.S. 195 (entered into force January 4, 1969; for the United States, November 20, 1994)), and the International Covenant on Civil and Political Rights (ICCPR) (International Covenant on Civil and Political Rights, December 19, 1966, 99 U.N.T.S. 171, entered into force March 23, 1976; for the United States, June 8, 1992).

### A. Role of *Amicus Curiae*

In *Caballero IV*, this court remanded to the circuit court for an evidentiary hearing on a single issue— whether the sentences of defendant and LaBoy are unconstitutionally disparate. In its *amicus* brief, Mexico has made claims under international law that were not presented in defendant's post-conviction petition and are, therefore, not properly part of this appeal.

Because the sole function of an *amicus curiae* is to advise or make suggestions to the court, this court has "repeatedly rejected attempts by *amic[i]* to raise issues not raised by the parties to the appeal." *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 62 (2001). "An *amicus* takes the case as he finds it, with the issues framed by the parties." *People v. P.H.*, 145 Ill. 2d 209, 234 (1991). In *Burger*, when the *amicus curiae* sought " 'to bring to the attention of this court additional argument which may be of interest to the court, but which is unlikely to be raised by either party' " (*Burger*, 198 Ill. 2d at 62), we declined to address the additional argument.

In the present case, Mexico is " 'not a party to the action but is, instead, a "friend" of the court.' " *Burger*, 198 Ill. 2d at 62, quoting *P.H.*, 145 Ill. 2d at 234. As such, Mexico is not entitled to present these claims in the present proceeding. Nevertheless, because Mexico has

framed its arguments under the Convention and the ICCPR in terms of the disparity of sentencing between defendant and his three co-offenders, we choose to address Mexico's arguments.

### B. The International Convention for the Elimination of All Forms of Racial Discrimination

The Convention was signed by the United States on September 28, 1966, but was not ratified by the Senate until October 21, 1994. By that date, defendant had been convicted and sentenced to death; his conviction and sentence had been affirmed on direct appeal (*Caballero I*, 102 Ill. 2d 23); his first-post conviction petition had been dismissed and that dismissal affirmed in part, reversed in part, and remanded for an evidentiary hearing (*Caballero II*, 126 Ill. 2d 248); the circuit court had held the required hearing and again dismissed defendant's claim; and this court had affirmed that ruling (*Caballero III*, 152 Ill. 2d 347).

Mexico has not suggested that the Convention applies retroactively to actions taken by the State of Illinois prior to ratification. Nor does Mexico suggest that any specific actions taken by the State prior to the ratification of the Convention violated the Convention. Rather, Mexico argues that this court's refusal, at this time, to vacate defendant's death sentence would have an "unmistakable discriminatory effect" because he is "the only Mexican citizen among the four offenders" and the only one of the four currently facing the death penalty.

As noted above, Aviles was sentenced to a term of 40 years' imprisonment and LaBoy received three consecutive life sentences. Ruiz was tried at the same time as defendant and was also sentenced to death. However, Ruiz's petition for post-conviction relief was granted and a new sentencing hearing ordered, based on ineffective assistance of counsel at the original capital sentencing hearing. See *People v. Ruiz*, 177 Ill. 2d 368 (1997). The

matter is currently pending in the circuit court of Cook County.

The Convention requires signatory states to "prohibit and eliminate racial discrimination in all its forms and to guarantee the right of everyone, without distinction as to race, colour, or national or ethnic origin, to equality before the law," including the "right to equal treatment before the tribunals and all other organs administering justice." International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195, art. 5(a). Discrimination is broadly defined: "any distinction, exclusion, restriction or preference based on race, colour, descent, or national or ethnic origin which has the purpose *or effect* of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life." (Emphasis added.) International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195, art. 1.

We accept Mexico's assertion that this definition encompasses any discrimination that might occur in the context of a criminal proceeding. However, we take exception to the emphasis placed on the words "or effect," and the lack of attention paid to the words "based on." Depending on the outcome of Ruiz's resentencing, defendant may, in the end, be the only one of the four killers to be executed for this crime. However, Mexico has not attempted to argue that this "effect" is in any way "based on" defendant's nationality.

The equal protection clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) also prohibit the type of discrimination claimed by Mexico on defendant's behalf. A defendant who alleges an equal protection violation has the burden of demonstrating either discriminatory intent

(*McCleskey v. Kemp*, 481 U.S. 279, 292-93, 95 L. Ed. 2d 262, 278, 107 S. Ct. 1756, 1767 (1987)), or discriminatory effect (*United States v. Armstrong*, 517 U.S. 456, 465, 134 L. Ed. 2d 687, 699, 116 S. Ct. 1480, 1487 (1996)). To show discriminatory effect, the defendant must demonstrate that similarly situated individuals were treated differently. *Armstrong*, 517 U.S. at 465, 134 L. Ed. 2d at 699, 116 S. Ct. at 1487.

During defendant's trial, he and his co-offenders were all believed to be United States citizens. After the defense suggested that defendant's written statement was coerced, or that he might not have understood what he was signing, the prosecutor tried to determine whether defendant was fluent in English. He asked defendant's mother, who was testifying for the defense, "He was born in this country, was he not?" She answered, "No." "Where was he born?" the prosecutor asked. "In Mexico," she replied. The State, thus, did not learn until after resting its case that defendant was born in Mexico and, even then, no follow-up questions were asked to determine his citizenship. Clearly, discriminatory intent was not present.

As for discriminatory effect, the State sought the death penalty for all three of the killers who went to trial. Only Aviles, who pleaded guilty and testified against LaBoy, received a fixed term sentence. For reasons only the 12 members of the jury know, LaBoy was spared the death penalty and received three consecutive sentences of natural life in prison. Defendant and Ruiz were tried simultaneously before separate juries, both of which recommended a sentence of death. That Ruiz subsequently won a new sentencing hearing does not offer any support for the suggestion that this defendant was somehow disadvantaged because of his nationality.

Defendant has received the benefit of every procedural safeguard provided by our state and national

constitutions and state statutes, including two post-conviction proceedings and appeals, each of which resulted in remand for an evidentiary hearing. He has failed to make a *prima facie* case of discrimination and, therefore, his claim under the Convention is rejected.

The remainder of the discussion in this section of Mexico's *amicus* brief is, in effect, an argument that defendant's sentence is disproportionate to LaBoy's. We have already rejected the argument that the two sentences are constitutionally disproportionate. We now reject the argument that the disparity between the two sentences violates the Convention. The Convention calls for individuals to be placed "on an equal footing" regardless of their nationality. In this case, the State treated defendant no differently than Ruiz and LaBoy, despite the different outcomes of their cases.

## C. The International Covenant on Civil and Political Rights

The ICCPR was ratified by the United States Senate on June 8, 1992. International Covenant on Civil and Political Rights, December 19, 1966, 99 U.N.T.S. 171 (entered into force March 23, 1976). As noted above, this event occurred long after the crime for which defendant was convicted and sentenced, and long after his direct appeal and the filing of his first post-conviction petition. It cannot be said that his initial prosecution, direct appeal, or first post-conviction proceeding violated the ICCPR because the United States was not a party to the Covenant at the time. The claim now advanced by Mexico must be read as a claim that actions by the State subsequent to June 8, 1992, have violated the ICCPR.

Mexico points to the disparity in sentences between defendant and LaBoy, implicitly acknowledging that until LaBoy was sentenced, defendant received every protection provided by the United States and Illinois Constitutions, including a jury trial, the assistance of counsel,

and the protection against self-incrimination. He obtained prompt and thorough review of his conviction and sentence by this court, and twice availed himself of the protections of the Post-Conviction Hearing Act. The only "violation" of the ICCPR that Mexico asserts is that it is simply unfair for defendant to face execution while LaBoy does not. We disposed of that argument above.

In addition, when ratifying the ICCPR, the United States attached a reservation, which stated that "the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment." U.S. Reservations, Understandings, and Declarations, International Covenant on Civil and Political Rights, 138 Cong. Rec. 8070, par. I(2) (1992). Because defendant's sentence has been found not to violate any constitutional constraints, it cannot violate the obligations undertaken by the United States when it ratified the ICCPR.

Defendant has not demonstrated that his civil or political rights were in any way limited as a result of his nationality.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court. We direct the clerk of this court to enter an order setting Tuesday, January 14, 2003, as the date on which the sentence of death entered by the circuit court of Cook County shall be carried out. Petitioner shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 2000). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where petitioner is now confined.

*Affirmed.*

104

JUSTICE RARICK took no part in the consideration or decision of this case.

JUSTICE KILBRIDE, dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I believe that defendant's convictions and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents, the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. For this reason, the new rules should be applied retroactively. See *People v. Caballero*, 179 Ill. 2d 205, 220-21 (1997). Therefore, I respectfully dissent.